FREDERICK ILTIS, Administrator, *vs.* CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

March 19, 1889.

Negligence—Departure from Rule and Practice.—The evidence in this action, brought against a railway company to recover damages for causing, through negligence, the death of plaintiff's intestate, examined, and *held* to justify a verdict for said plaintiff.

Amendment at Trial—Specific Questions for Jury.—Certain alleged errors, concerning the refusal of the trial court to permit an amendment to the answer; in regard to its refusal to submit for the consideration of the jurors, and for them to pass upon, specific findings of fact, as requested by defendant, and various rulings upon the admission or exclusion of evidence, considered and disposed of.

Appeal by defendant from an order of the district court for Carver county, refusing a new trial after a trial before *Edson,* J., and verdict of $2,000 for plaintiff.

*W. H. Norris,* for appellant.

*W. C. Odell* and *H. J. Peck,* for respondent.

COLLINS, J. The plaintiff, as administrator of the estate of one Happ, brought this action against defendant railway company, to recover damages for causing, through negligence, the death of his intestate, in the month of June, 1886, and secured a verdict in the court below. From an order denying a new trial, defendant appeals.

The appellant's main line of road runs through the village of

v.40M—18

Chaska, easterly and westerly, and about 300 feet south of the brick-yard of Riedele & Sons, in which Happ had worked as a common laborer some two years when killed. A spur track, used solely for Riedele & Sons, extends from the east side of their brick-yard along in front of the kilns across Pine street, near its intersection with Sixth, and thence obliquely over and across Sixth to the main line. The general course of this spur or side track is southwesterly, and it is nearly 500 feet in length. Between the yard and the main line is another spur, known as the "Bierline side track," the switch thereof being some 300 feet south of the kilns. More or less switching was done in the forenoon of each secular day in this vicinity by a locomotive and crew of men, who came for that purpose from another station, the men being well acquainted with the work. The switching done upon the Riedele track consisted in first taking out loaded cars,—usually six or seven in number,—and then putting in empties, and cars filled with wood for use in making brick. This was done almost daily, and these cars were usually left, coupled together, east of the plank crossing upon Pine street, and near the kilns. Occasionally a part would be left between the plank crossings on Pine and Sixth, in the streets. As the empties were needed for loading, or as the wood could be unloaded during the day, laborers from the yard would uncouple a car, and by hand easily push it down grade to the desired point opposite the kilns. This practice was well known to the switching crew, as was shown by the testimony. And it was also well established upon the trial that it was the invariable custom of the train-men to make up the cars destined for the brick-yard side track out on the main line and Bierline spur, in the exact order indicated by a "switching list" prepared by the station agent or under his supervision, and then set them in in such order. In other words, it was the rule to put the cars for the yard in a certain order elsewhere, and then, by one trip of the locomotive upon the side track, place them, coupled together, where they would remain until moved by the laborers,—Happ being one of the men who habitually helped in the moving. This long established practice was not observed upon the day of the accident. Seven cars,—three filled with wood,—had been set apart for the brick-yard switch, and a list furnished the conductor.

The seven had been placed in the designated order upon the Bierline spur, (the wood-cars being the fourth, fifth, and sixth from the locomotive, which was attached at the west end of the string,) when a transposition was ordered, so as to place a car of wood nearest the kilns.

The appellant claims that this order was given, just as the train was moving, by one of the proprietors of the yard, who happened to board the third car from the locomotive about this time. This is denied by the person so charged, although he admits having so directed the station agent earlier in the day. We fail to see that discussion over this point is of any consequence to appellant, for it is immaterial who caused the shifting of the cars, if thereby negligence resulted, and deceased, without contributing to such negligence, lost his life.

In order to put the wood first upon the side track the train was pulled off from the Bierline spur, and westerly along the main line to within a few rods of the brick-yard switch, when it was uncoupled between the fourth and fifth cars, both of which were loaded. This left three empties, and one box car filled with wood, attached to the engine, while one empty and two loaded remained on the main line. The four cars attached to the locomotive—the one filled with wood now in the front—were then pushed easterly along the side track in the direction of the kilns until they cleared the planking at the Pine-street crossing, when the engine returned to the main line for the balance of the train. It is obvious that immediately after this Happ and two other laborers from the yard came to the west end of the car of wood, and commenced to push it along further east. While so doing, and before they had gone many feet, the locomotive returned with the three cars, pushed them along until they struck those previously placed on the side track, throwing all forward with sufficient force, and in such a violent manner, that the deceased was caught and crushed (as he was pushing the wood-car) so seriously as to cause his death the next day.

Twenty-three errors are assigned by appellant, and these may be condensed into five, for consideration in this opinion. *First*, error in refusing to allow an amendment to the answer; *second*, in exclud-

ing certain testimony offered by appellant; *third,* in refusing to submit specific questions for the jurors to answer with their general verdict; *fourth,* in giving certain instructions to the jury ; *fifth,* in holding that the evidence justified the verdict.

The answer admitted, we think, although this was not unreservedly conceded by appellant's counsel upon the trial, that Happ's death directly resulted from the accident. The amendment, which was not proposed until the second day of the trial, withdrew this admission, and asserted that the accident was but a remote cause of the death. The application to amend is always addressed to, and must largely rest in, the discretion of the court. There was no abuse of discretion in the refusal to permit the amendment asked. It follows that many questions thereafter asked, which would have been pertinent under different issues, were immaterial and irrelevant, as held by the court when objection was made.

The appellant argues that the court erred greatly in excluding testimony tending to show that it was the custom of the yard-men to keep away from the cars while switching was in progress. The court properly sustained an objection to a question concerning this custom, but notwithstanding the ruling the witness seems to have answered. He stated that he had never known nor had he seen yard-men about while switching was being done. Had appellant followed its usual method on this occasion, and put the seven cars on the side track as a whole, and by one trip of the locomotive, the custom of the laborers might have been material. Had it pursued its usual course, the deceased and his fellow-servants would have done their work in perfect safety. Although the custom seems to have been shown despite the attempt to exclude it, it was immaterial, the circumstances not being the same.

In a proper exercise of its discretion the court refused to submit and send out with the jury six special findings prepared by counsel for the appellant, to which he asked answers. Nearly all were immaterial. Their discussion by the jurors would have led to much confusion over matters of little or no moment, while the views of the jury, whether affirmatively or negatively expressed, would be of no value to either of these litigants. We see no reason for sustaining

the counsel's assertion that the court in its rulings upon this question abused its discretion.

The charge of the court stated the rules of law which govern actions of this character—so well known that repetition is unnecessary—concisely, completely, and with evident fairness. Possibly paragraphs might be found which, considered independently of those which preceded or followed, might have misled, but as a whole it was without contradictory or irreconcilable propositions. We are confident that by it the jury was well and fairly advised of the law applicable to the issues.

We now approach a brief review of the facts as they were disclosed by the evidence, and a discussion of the appellant's contention that the verdict of the jury was manifestly and palpably against the weight of the testimony. To sustain the charge that the trainmen were negligent in handling appellant's locomotive and cars when going upon the side track a second time, testimony was introduced by the plaintiff tending to show that the usual signal—ringing the bell—was omitted, and a negligent and dangerous rate of speed maintained, by means of which the six cars immediately in front of the engine were violently and negligently precipitated forward onto the one which was being moved to its destination near the kilns. There was testimony that the bell upon the locomotive was not rung at all, by one or two persons who seem to be very positive about it, as well as by others who claim to have been in a position to hear it had it been in motion, and did not. Should we agree with counsel for the appellant that the preponderance of the testimony on this point is with him, the verdict could not be set aside for that reason alone. There was testimony which would warrant the jurors in concluding that the customary signal of warning was not given when the second instalment of cars was being pushed along the side track for coupling with the others. We have not overlooked *Harris* v. *Minn. & St. Louis Ry. Co.*, 33 Minn. 459, (23 N. W. Rep. 850,) cited by counsel as recognizing the distinction which should be made between positive testimony that signals were given and negative testimony that they were not,—a doctrine which he claims is pertinent here. In that case plaintiff attempted to show by one witness, who did not claim to

have been in a position to hear had they been given, that the customary signals—sounding the bell and whistle—were neglected as the train approached a road-crossing, while, upon the other hand, there was positive evidence that the bell was rung and the whistle blown in a proper manner and at the usual place. As it did not appear probable that plaintiff's witness would have heard the signals had they been given, his testimony, simply that he did not hear them, was considered as of no value whatever as against positive evidence to the contrary. Had the plaintiff's witness in that case been in a position to hear the signals if sounded, the testimony could not have been characterized as valueless. Here the disagreement between the witnesses as to the ringing was as sharply drawn as it well could be. In this connection we call attention to the fact that when in this vicinity, when on the main as well as side tracks, it was the habit to sound the bell continually, according to appellant's witnesses; that the cars which were being put on the brick-yard spur preceded the motive power, upon which was the bell; that in such a position its ringing would naturally attract less attention than if it had been in front of instead of behind the cars; and that, had the deceased heard it,—a second trip upon the spur being a departure from the rule, and therefore unexpected by Happ and those with him,—there might be some excuse for suggesting that these men were liable to be misled, and to have assumed that the ringing was out on the main line.

The testimony shows that defendant had no brakeman upon the cars first set in. They seem to have been left under the management of one of Happ's employers,—Anton Riedele,—and two young boys, one of whom was at the brake on top and at the easterly (front) end of the car of wood. When the locomotive reached the Pine-street crossing, it was cut off, and immediately returned to the main line. The cars then ran slowly along towards the kilns, until stopped by the setting of the brakes by Riedele and his companions. The boy upon the wood-car, directed so to do by Riedele, clambered down, and uncoupled it from the others, and then returned to the brake. It began to move down grade about the time the laborers commenced to push on the westerly end, and had gone but a few feet (10 or 15) when Riedele discovered the approach of the balance of the consign-

ment of cars, and shouted to the boys to seize the brakes and prepare for the shock, which he seems to have realized as imminent. It is apparent that Riedele knew that all the cars were not put in together, but it is not shown that he was aware of the position of Happ, or that his men were anywhere about the wood. But had it been, or had it appeared that his misconduct and negligence contributed to the injury, that would have been no excuse for the appellant. There is much difference of opinion between the witnesses as to the rate of speed with which the last cars were sent upon the spur. We can best judge of the momentum by the results. These clearly indicate that they came back to the stationary cars with force sufficient to make considerable noise as they collided, and to cause Riedele and the boys some difficulty in maintaining their places on top, although they were sitting down, holding to the brakes, prepared for the crash. It is also evident that they came back with such rapidity and violence as to put three cars, with set brakes, in rapid motion, and to propel them forward with speed and suddenness sufficient to overtake and catch the men at the rear of the wood-car, 10 or 15 feet in advance, and already moving. Without considering the testimony of the two persons who assert positively that one of the train-men, either from the ground or from the top of one of the cars, used vigorous language to the engineer because he did not "back up" with more force, these facts and circumstances tend strongly to indicate that, whatever the rate of speed may have been, the locomotive and cars were not properly controlled. The appellant's negligence was well demonstrated by the testimony.

The case therefore resolves itself into a question of contributory negligence. Happ had been steadily employed about the yard for some two years, assisting daily in pushing cars into position east of the place where usually left by the appellant. From daily observation he could have and undoubtedly did learn the well-established method of putting cars upon the spur; that it was safe for him to approach and work about the cars after the locomotive had once appeared and withdrawn; and that there was no danger to be apprehended, because the locomotive was upon another track, engaged in other business. There was nothing to indicate that on this day there would be a dangerous

departure from the common practice of at least two years' standing, or to suggest that he could not perform his ordinary work with as perfect safety as on previous occasions. The deceased, educated by the appellant's customary habit, had a right to depend to some extent upon his knowledge, to rely upon a well-generated conviction that it was an ordinarily safe place, when one trip had been made, and the cars left upon the side track. Of course this knowledge of the common practice would not warrant indifference or carelessness by those engaged about such a place, for it always has its hazards; but it would excuse a want of that care and diligence imposed upon people when approaching and crossing railways in general. It would, in a degree, absolve one should he be less alert and watchful when going upon the track.

It is impossible to say that the deceased took the precaution to look and listen before stepping upon the track, but the testimony discloses that persons occupying a much more elevated position, on top of the cars, (some of whom knew that the engine would return,) neither saw nor heard its approach until a moment before the collision. It is also evident that several men in the vicinity did not hear or see it until the crash came, while others, who saw it and watched its coming, state that they did not hear the bell sound. And one of Happ's comrades testifies that just as he closely followed Happ in between the cars, he looked and saw the locomotive "pushed out" at the switch. If Happ used his eyes it is fair to presume that he too saw the engine in a position upon the main line which had for a long period of time—without a single exception, so far as the record shows—signified absolute safety to those employed about the brick-yard. If by listening when he went upon the track he could not hear a note of warning because there was none, or if, by looking, he was lulled into a sense of security by reason of the well-settled custom of the appellant, it would not seem to be important to show that he was vigilant or did either. The deceased was bound to exercise such diligence as persons of common prudence and intelligence would exercise under the circumstances. In considering what ordinary prudence required with the surroundings of this transaction, regard must be had to the danger to be apprehended, the reasonable probability of incurring it,

as well as the natural presumption that the appellant would discharge its duty and act with due care. See *Shaber* v. *St. Paul, M. & M. Ry. Co.*, 28 Minn. 103, (9 N. W. Rep. 575.) The deceased cannot be charged with negligence by failing to anticipate some particularly negligent act of the train-men, or, as in this instance, (if the plaintiff's witnesses and manifest results of the collision can be depended upon,) their evident negligence in putting the second section of cars upon the side track without warning, without a lookout, and at a dangerous rate of speed.

Order affirmed.